UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 23 Cr. 236 (PAE) |
| -v- | |
| DANIEL RIVERA, | OPINION & ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to suppress evidence (predominantly a 10-kilogram stash of fentanyl bricks) that officers seized on October 11, 2022, while conducting an inventory search of defendant Daniel Rivera's van. Rivera argues that his Fourth Amendment rights were violated when, after arresting him for traffic violations, the officers impounded and then searched the van. For the reasons that follow, the Court denies the motion to suppress.

## I.    Overview and Procedural History

On October 12, 2022, Rivera was charged by Complaint with possession of fentanyl with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A). Dkt. 1 ("Compl.") at 1. On May 10, 2023, a grand jury returned a one-count indictment against Rivera charging the same offense. Dkt. 22 at 1.

As developed below, this charge arose out of an October 11, 2022 traffic stop of Rivera's van by New York City Police Department ("NYPD") officers and Drug Enforcement Administration ("DEA") agents, working together as part of the New York Strike Force (the "Strike Force"). Dkt. 38 ("Def. Mem."), Ex. 1 at 2–3; Suppression Hearing Transcript ("Tr.") 15. The officers had been drawn to the van in the course of a narcotics investigation and located it using cellphone location data obtained from a warrant to track Rivera's cellphone (the "Target

Cellphone"). *See* Def. Mem., Ex. 1 at 2–3. The officers stopped the van near 735 Exterior Street in the Bronx after observing that it had a broken brake light, and arrested Rivera for driving with a broken brake light and a cracked windshield. Compl. at 2–3. The officers impounded the van and transported Rivera and the van to NYPD's 44th precinct, where, pursuant to protocols governing impounded vehicles, officers conducted an inventory search of the van. *Id.* at 3. That search uncovered a large black garbage bag containing 10 bricks that together contained 10 kilograms of mixtures and substances containing fentanyl. *Id.*; Tr. 38 (Hadzewycz).

On August 28, 2023, Rivera moved to suppress the evidence found during the search on the ground that the search violated the Fourth Amendment. Dkt. 37. In support, he filed a memorandum of law, Def. Mem., and exhibits, including his affirmation, Def. Mem., Ex. 5. On September 11, 2023, the Government filed an opposition, arguing that: (1) officers had probable cause to stop Rivera; (2) officers had lawfully impounded the van, rather than leave it unattended on a busy commercial street; (3) the ensuing warrantless search of the van was lawful under the inventory search exception to the Fourth Amendment's warrant requirement; and (4) in the alternative, the search fell under the automobile exception to that requirement. Dkt. 39 ("Gov't Opp."). On September 14, 2023, Rivera filed a reply. Dkt. 41 ("Def. Reply").

On September 29, 2023, the Court held a suppression hearing, at which it received physical evidence and heard testimony from three members of the Strike Force who participated in the narcotics investigation on October 10 and the traffic stop and arrest of Rivera on October 11. The testifying officers were: DEA Special Agent Mark Hadzewycz, who was a DEA case agent; and NYPD Officers Richard Hyde and Andrew Dossi, who, with Agent Hadzewycz, participated in the investigation, traffic stop, and arrest.

## II.   Factual Findings

### A.  Evidence Considered

On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

The Court's factual findings are based on the hearing testimony of the three witnesses, Rivera's pre-hearing affidavit, *see* Def. Mem., Ex. 5,[1] and exhibits received at the hearing.  These consisted of: (1) Google Maps street and grid views of the streets where officers first encountered and later stopped Rivera, GX 101–104; (2) the portion of the NYPD Patrol Guide governing inventory searches of automobiles and other property, GX 105; (3) Rivera's traffic tickets filled out by Officer Dossi, GX 201–203; (4) the NYPD property clerk invoice of the items from Rivera's van that were vouchered and inventoried during the inventory search, GX 204; (5) the vehicle seizure form, GX 205; (6) photographs of Rivera's van, GX 206A–206G; (7) photographs of a black garbage bag found inside Rivera's van, which contained 10 bricks of suspected narcotics later shown to include fentanyl, GX 206F–206H; (8) cellphone subscriber information, indicating that Daniel Rivera was the subscriber of the Target Cellphone, GX 302; (9) an electronic surveillance log of the Target Cellphone on October 11, 2022, GX 303; (10) a screenshot of text messages sent to the Target Cellphone number, GX 304; and (11) audio recordings of the phone calls between an undercover officer and the user of the Target Cellphone, GX 305–308.

---

[1] The Court affords Rivera's account less weight because he did not testify and so his account was not subjected to cross-examination. *See, e.g., United States v. Calix*, No. 13 Cr. 582 (RPP), 2014 WL 2084098, at *1 n.1 (S.D.N.Y. May 13, 2014) (citing, *inter alia, United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order)); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

### B. Facts Established

The Court finds the following facts. These are largely undisputed, save as to (1) the circumstances surrounding how Rivera's cellphone was handled; and (2) the officers' reasons for impounding Rivera's van. Where the Court has cited testimony, it has credited it, except as otherwise indicated. The Court has given close attention to credibility determinations, in making which the Court evaluated the testimony at issue in light of, *inter alia*, the witness's demeanor, competence, bias, and the extent to which the testimony was inherently logical and consistent with others' testimony and physical evidence.

### 1. The Narcotics Investigation Leading to Rivera's Van

On October 10, 2022, a confidential source provided the New York Strike Force[2] with a cellphone number ending in 2377 (the Target Cellphone), belonging to an unidentified person believed to be distributing and transporting fentanyl to the New York City area. Def. Mem., Ex. 1 at 2; Tr. 16–18 (Hadzewycz). That evening, around 7 p.m., an undercover NYPD officer called the cellphone number to arrange a time to pick up "pieces" from the unidentified person. Def. Mem., Ex. 1 at 2. Based on training and experience, the undercover officer understood "pieces" as code for "kilogram quantities of narcotics." Tr. 17 (Hadzewycz). Speaking in Spanish, the two agreed to meet the next day in the Bronx for the delivery. *Id.*; Def. Mem., Ex. 1 at 2. About an hour later, the unidentified man called the undercover officer to reschedule the delivery for later that night. *Id.*; Compl. at 2. But the undercover officer declined, and they agreed to keep the delivery the next day in the Bronx. Def. Mem., Ex. 1 at 2.

---

[2] The New York Strike Force is a task force comprised of local, state, and federal agencies targeting domestic and international drug trafficking. Tr. 15 (Hadzewycz). The agencies involved in the Strike Force team that arrested Rivera were the NYPD, the New York State Police, and the DEA. *See id.* at 16 (Hadzewycz).

The morning of October 11, 2022, Magistrate Judge Gabriel W. Gorenstein issued a warrant authorizing pen-and-ping tracking of the Target Cellphone. *Id.*; Gov't Opp., Ex. A. Judge Gorenstein ordered the service provider to provide the investigating agencies: (1) prospective location information of the Target Cellphone, including all available precision location information and cell site data for 45 days; (2) historical cell site location information and toll records between October 1 and 11, 2022; and (3) pen register and trap and trace device information, capturing dialing, routing, addressing, and signaling information associated with each voice, text, or data communication transmitted to and from the target cellphone for 45 days. Gov't Opp., Ex. A. at 15–17.

That day, members of the Strike Force used this tracking data to help locate the Target Cellphone. *See* Def. Mem., Ex. 1 at 2. At first, the Target Cellphone appeared to be in the West New York, New Jersey area. *Id.* Officers headed there to conduct surveillance. *Id.* While doing so, Special Agent Hadzewycz received T-Mobile subscriber information showing that the Target Cellphone was registered to Daniel Rivera. Tr. 20–21. Commercial database checks showed that Daniel Rivera had both Illinois and Wisconsin driver's licenses.[3] *Id.* at 22–23 (Hadzewycz). Agent Hadzewycz then obtained a photograph of Rivera, and shared it with the field team, which he instructed to look out for a vehicle with an Illinois or Wisconsin license plate. *Id.* at 25.

Officers were unable to locate the Target Cellphone in New Jersey. Def. Mem., Ex. 1 at 2. Updated cellphone location data showed the Target Cellphone moving towards New York, near Yankee Stadium in the Bronx. *See* Tr. 25–26 (Hadzewycz). The quick and continuous

---

[3] After Agent Hadzewycz received the T-Mobile subscriber information, he conducted searches of Daniel Rivera's licenses. His searches suggested, but in his assessment did not conclusively establish, that one or both were expired or suspended. *See* Tr. 22–24, 46–47.

movements of the Target Cellphone led the officers to suspect the phone was in a moving vehicle. *Id.* at 80–81 (Hyde). Agent Hadzewycz then applied for a cell-site simulator warrant, authorizing electronic tracking of the Target Cellphone to "identify[] [its] precise location." Def. Mem., Ex. 3 at 3. At 4:11 p.m., Judge Gorenstein signed the warrant.[4] *Id.* at 26.

### 2. The Stop of the Van and the Arrest of Rivera

At 4:12 p.m., an Officer Pomerantz on the field team notified the team that he had observed a white Ford van bearing an Illinois license plate driving along Jerome Avenue in the Bronx. *See* Def. Mem., Ex. 1 at 2. Observing that the driver looked like the driver's license photo of Rivera, Officer Pomerantz and other officers followed the van. *See* Tr. 26 (Hadzewycz). They followed it as it drove south on Jerome Avenue toward Yankee Stadium, as it merged briefly onto the Major Deegan Expressway, and as it took an off-ramp onto Exterior Street, a commercial road that runs directly under the Major Deegan Expressway near Yankee Stadium. *See id.* at 27–28 (Hadzewycz); GX 102. The officers had noted that the van's left brake light was broken. Tr. 28 (Hadzewycz), 82 (Hyde). Officers stopped the van near 735 Exterior Street at 4:16 p.m.[5] Def. Mem., Ex. 1 at 3; Compl. at 2. The officers decided to pull over the van at this point, rather than earlier on the Major Deegan Expressway, because "[i]t was the safest place to pull him over to do a traffic stop." Tr. 84 (Hyde).

After the car was stopped, Agent Hadzewycz was the first to approach the driver's side of the van and noticed a cellphone in the driver's hand. *Id.* at 28. He told the driver, whom he

---

[4] Because Rivera's van was found soon thereafter, officers did not have occasion to activate the cell-site simulator. Tr. 26 (Hadzewycz).

[5] The officers involved in the traffic stop were Officers Ortiz, Hyde, Sarnatora, Dossi, Veit, Investigator Madera, Special Agents De Leon, Dalton, Hadzewycz, Sergeants Pellerano and Boylan, and Lieutenant Pomerantz. *See* Tr. 72 (Hadzewycz); Def. Mem., Ex. 1 at 2.

identified as Rivera, that he had been pulled over on account of the broken left brake light. *See* Def. Mem., Ex. 1 at 3. While approaching the van, Agent Hadzewycz also observed, and pointed out to Rivera, several large cracks in the front windshield. *Id.* Other officers approached the van, removed Rivera from it, and handcuffed him. Tr. 29 (Hadzewycz).

The officers then asked the driver for his name; the driver responded that he was Daniel Rivera, the van's registered owner. *Id.* (Hadzewycz). Officers then read Rivera his *Miranda* rights and asked for verbal consent to search the van. *Id.* (Hadzewycz). Rivera exercised his right to not answer any questions and declined to consent to a search.[6] *Id.* (Hadzewycz). Officers then asked Rivera for his driver's license. *Id.* 33 (Hadzewycz). Rivera could not produce one, producing a U.S. passport instead. *Id.* (Hadzewycz).

After Rivera was handcuffed, Agent Hadzewycz noticed that his cellphone was left on the driver's seat. *Id.* at 30. Agent Hadzewycz did not recall how the cellphone ended up on the driver seat—whether Rivera had left or dropped it there while being removed from the car, or whether an officer had taken it at the time of Rivera's removal and placed it there. *Id.*

Agent Hadzewycz then called the Target Cellphone number to see if the Target Cellphone belonged to Rivera. *Id.* Although the officers could not recall whether Rivera's cellphone rang, vibrated, or visually lit up, all three recalled observing that Rivera's cellphone had "activated" in response to Agent Hadzewycz's call. *Id.* at 30–31 (Hadzewycz), 86 (Hyde), 121 (Dossi). Agent Hadzewycz then picked up Rivera's cellphone from the driver's seat, to confirm that it was

---

[6] In his affidavit, Rivera alleges the officers stated to him that, in not consenting to the search, he was hiding something. Def. Mem., Ex. 5 at 2. Agent Hadzewycz and Officer Hyde denied, and do not recall any other officer, making statements along these lines. Tr. 29 (Hadzewycz), 84–85 (Hyde). Because the Court found the officers' accounts credible, and because Rivera's account was not subjected to cross-examination, the Court credits the officers' account over Rivera's. Resolution of this dispute did not affect the resolution of the suppression motion.

responding to his phone call, and "observe[d] [his] cellphone number on the screen" of Rivera's cellphone.[7]  *Id.* at 30.

Officers told Rivera that he would be brought to the precinct based on the broken taillight, cracked windshield, and his inability to produce a valid driver's license.  *See id.* at 88 (Hyde).  Rivera was ticketed for the three offenses: (1) a broken brake light, in violation of New York Vehicle and Traffic Law § 375(20)(I); (2) a cracked windshield, in violation of New York Vehicle and Traffic Law § 375(22)[8]; and (3) driving a vehicle as an unlicensed operator, in violation of New York Vehicle and Traffic Law § 509(1).  *See* GX 201–203.  He was arrested for the first two offenses.  Compl. at 3.

### 3.  The Decision to Impound the Van

The officers on the scene decided to impound Rivera's van and bring it back to the precinct where it would be subjected to an inventory search.  The basis for the impoundment decision was a focus of the testimony at the hearing.  All three witnesses testified that the objective circumstances surrounding the stop left no realistic alternative to impounding the van, and that such was or would have been obvious to all the law enforcement personnel on the scene.  For the reasons reviewed below, the Court credits this testimony.

---

[7] In his affirmation, Rivera recounts the events slightly differently.  He states that "Agent Hadzewycz was holding my cellphone in his hand.  I was approximately fifteen feet away from them at this time.  I witnessed the Hispanic male call my cellphone and exclaim, "that's it," when it began to ring in Agent Hadzewycz's hand.  Def. Mem., Ex. 5 at 3.  Because the Court finds the officers' testimony credible and Rivera's account was not subjected to cross-examination, the Court credits the officers' account on this point.

[8] The ticket, completed by Officer Dossi, recited the incorrect section of New York's Vehicle and Traffic Law as to the broken-brake-light offense.  Def. Mem., Ex. 4.  New York Vehicle and Traffic Law § 375(40)(b), not § 375(20)(I), prohibits driving with a broken brake light.

The manner in which the impoundment decision was reached was also a subject of testimony. Agent Hadzewycz recalled limited on-scene discussion on this point, but recalled stating to others that, as the van was believed to contain narcotics, it could not be left unattended in public. *See* Tr. 65–66. Officer Hyde did not recall any discussion on whether to impound the van. *See id.* at 89. Officer Dossi recounted a limited discussion, where officers noted that they "[m]ost likely couldn't leave the vehicle there." *Id.* at 117. Agent Hadzewycz, Officer Hyde, and Officer Dossi each testified that they understood Sergeant Pellerano, as the ranking on-scene NYPD official, to have made the decision to impound. *See id.* at 35 (Hadezewycz), 88–89 (Hyde), 116 (Dossi). The Court credits that there was limited discussion on this point, that the impoundment decision was universally understood by those present to be required by the circumstances, and that, to the extent there was one decisionmaker as opposed to a collective appreciation of the need to impound, Sergeant Pellerano was responsible for that decision. But, because he did not testify, and because no witness testified to having been privy to a discussion with him, the Court was not presented with direct evidence as to his real-time thinking.

The bases that the three testifying witnesses cited as making impoundment necessary included the following. Rivera had been driving alone—there was no passenger or other person on-scene who could take possession of the van. *Id.* at 35 (Hadzewycz), 116 (Dossi). The van had been stopped on Exterior Street, a busy two-way commercial road underneath the Major Deegan Expressway with visible "no parking" signs. *Id.* at 35–36 (Hadzewycz), 97 (Hyde), 116 (Dossi). There were no designated parking spaces and no shoulder. *Id.* at 36 (Hadzewycz), 89 (Hyde), 116–17 (Dossi). There was thus no place to leave the van that would neither block traffic nor breach a no-parking rule. *Id.* at 89–90 (Hyde). Exterior Street was also close to Yankee Stadium, where Game 1 of the American League Division Series was to be played that

evening, and the "area was getting busy with traffic." *Id.* at 68–69 (Hadzewycz).  The van could

have gotten "ticketed," "towed," or "broken into" if left unattended, *id.* at 36 (Hadzewycz); *See*

*id.* at 89 (Hyde), 116 (Dossi).  And the van, out of which Rivera appeared to have been living,

was visibly—through its windows—full of personal items; these made it an inviting target of a

break-in.  *Id.* at 37 (Hadzewycz), 90 (Hyde), 116 (Dossi).  Finally, based on the narcotics

investigation and the transaction the undercover had arranged with Rivera in the Bronx for that

day, officers suspected there were "narcotics in the vehicle."  *Id.* at 36 (Hadzewycz).  Leaving

the van unattended posed "safety concern[s]" for the public, given the possibility that people

might break into the van and come into contact with (or use or distribute) the drugs.  *Id.*

      The Court credits that each of the testifying officers genuinely and firmly appreciated in

real time that impoundment was necessary as a matter of community caretaking.  *See, e.g.*, *id.* at

36 (Hadzewycz) ("[I]t's not an area where you want to park a car.  You can risk getting ticketed

or towed or maybe broken into possibly.  But because of our investigation, we're concerned that

because of the possibility of narcotics in the vehicle that was also a safety concern for members

of the public."); *id.* at 89 (Hyde) ("[E]verybody in the NYPD pretty much knows we can't leave

that vehicle there. . . .  First off, we had probable cause. . . .  Also on the other side of that you

can't leave a car in a commercial area like that.  There's no parking.  There's no shoulders.

That's just a two-lane street."); *id.* at 116 (Dossi) ("[I]n a situation like that it's like a must.  You

have to bring it back.  That area was an industrial area.  You can't park vehicles over there.  He

was the only occupant of the vehicle.  So you can't leave the vehicle.").  The Court finds that the

officers were motivated to impound the van, in part, by these purposes.

      At the same time, the Court finds that the officers—particularly the DEA agents who had

participated in the undercover operation that had identified Rivera as headed towards a sale of

kilogram-quantity "pieces" of narcotics—had a separate, investigative motivation to impound the van. As Agent Hadzewycz acknowledged, he was interested in searching the van, believing that Rivera was a "narcotic[s] courier" and that the van held narcotics. *Id.* at 51–52. The officers also understood that, under NYPD procedures, impoundment would result in an inventory search of the van. *Id.* at 67 (Hadzewycz), 93 (Hyde). The officers' interest in searching the van for investigative reasons, the Court finds, also informed the decision to impound it.

### 4. Events at the 44th Precinct Including the Inventory Search of the Van

Officers then brought Rivera to NYPD's 44th precinct to be processed for the traffic infractions. Compl. at 3. Officers separately transported the van to the precinct. *Id.*

At the precinct, Officer Hyde, joined by Agent Hadzewycz, performed an inventory search of the van, as required by the NYPD Patrol Guide. *See* GX 105 ("Whenever any property comes into the custody of this Department an inventory search will be conducted . . . ."). Officers comprehensively vouchered, inventoried, and itemized the items found. Tr. 92 (Hyde). Because the van was filled with personal possessions, including clothes, tools, and bedding, the inventory search took several hours to complete. *Id.* at 52 (Hadzewycz). During it, Agent Hadzewycz found a large black garbage bag underneath two suitcases in the rear storage area of the van. Def. Mem., Ex. 1 at 3. Inside were 10 bricks of suspected narcotics, which field-tested positive for heroin. *Id.* Laboratory tests later found that the bricks consisted of 10 kilograms of mixtures and substances containing fentanyl. *Id.* Officers also found a drawstring bag with packaged marijuana and wrapping paper on the front passenger seat. *Id.* Officers filled out a property clerk invoice to record the items found. *See* Tr. 118 (Dossi); GX 204.

At the precinct, officers also determined that Rivera had a suspended license. Def. Mem., Ex. 1 at 3. Officers issued him a summons for a defective brake light, a cracked windshield, and

driving without a valid driver's license. *Id.* Rivera was transported to the Metropolitan

Detention Center in Brooklyn. *Id.* The next day, he was charged by Complaint.

## III.   Discussion

In pursuing suppression of the fruits of the inventory search, Rivera makes a series of

arguments: that the decision to impound the van was unlawful; that the inventory search was not

conducted pursuant to standardized procedure; and that the Government's alternative argument

that the automobile exception to the warrant requirement independently permitted the search of

the van lacks merit.  The Court addresses these arguments, after first briefly addressing a point

Rivera concedes: that the stop of the van was justified by probable cause of a traffic violation.

For the following reasons, the Court finds, the Government has shown by a

preponderance that the officers lawfully stopped Rivera and seized and searched his van.  As an

alternative basis to uphold the search, the Court finds, the Government has shown that, under the

automobile exception, the officers had probable cause to search the van for evidence of narcotics

trafficking.

### A.   The Stop of Rivera's Van

#### 1.   Applicable Legal Principles

The Fourth Amendment guarantees "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

It is reasonable under the Fourth Amendment to make a traffic stop when officers have probable

cause, or reasonable suspicion, to believe a traffic violation has occurred. *See Whren v. United*

*States*, 517 U.S. 806, 810 (1996); *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009).

And where an officer has observed a traffic violation, his subjective motivation for stopping the

vehicle is irrelevant to whether the stop complies with the Fourth Amendment. *Whren*, 517 U.S.

at 810–13 (citations omitted).  During a stop, an officer may question the occupants of the vehicle about matters unrelated to the stop, provided that the inquiries do not measurably extend the duration of the stop.  *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

### 2. Discussion

Rivera does not dispute that the officers had probable cause to stop his van, making the stop reasonable.  And for good reason.  It is undisputed that, when the officers encountered Rivera's white Ford van driving along Jerome Avenue in the Bronx, they noticed that the van's brake light was broken.  Tr. 28 (Hadzewycz).  New York Vehicle and Traffic Law § 375(40)(b) prohibits driving with a broken brake light.  Having observed a traffic violation in progress, the officers had probable cause of such a violation, justifying stopping the van.  *See United States v. Foreste*, 780 F.3d 518, 523–24 (2d Cir. 2015) (affirming denial of suppression motion where officers had observed vehicular infractions before making stops).  Under *Whren*, that the officers, including Agent Hadzewycz, subjectively were motivated to stop the van based on suspicion that driver Rivera was the supplier for an imminent narcotics transaction did not detract from the reasonableness of the traffic stop.

After the van was stopped, the officers gained evidence supplying probable cause of another vehicular infraction: the van had cracks on its front windshield, in violation of New York Vehicle and Traffic Law § 375(22).  *See* Def. Mem., Ex. 1 at 3; GX 202.  And Rivera could not produce a driver's license, leading officers to believe he was an unlicensed operator under New York Vehicle and Traffic Law § 509.  *See* Tr. 33 (Hadzewycz); GX 203.  After brief questioning of Rivera about his name and matters related to the stop, the officers then arrested Rivera for: (1) the broken brake light; and (2) the cracked windshield.  *See* Compl. at 2–3.  These arrests were permitted under New York law, which allows warrantless arrests for "petty offenses,"

including "traffic infractions." *See* N.Y. Crim. Proc. Law §§ 140.10(1)–(2); *see also id.*

§ 1.20(39) (defining petty offense as "a violation or a traffic infraction"). Rivera does not

contend, and the evidence does not support, that there was questioning about matters extraneous

to the stop, let alone that such measurably extended the duration of the stop. The stop and its

duration were thus lawful.

## B. The Search of Rivera's Van

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject

only to a few specifically established and well-delineated exceptions." *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 481 (1971). The Government argues that the inventory search and

automobile exceptions to the warrant requirement independently justified the warrantless search

here. The Court examines these asserted bases in turn.

### 1. The Impoundment and Inventory Search

#### a. *Applicable Legal Principles*

Police have authority, despite lacking a warrant, "to seize and remove from the streets

automobiles in the interests of public safety and as part of their community caretaking

functions." *United States v. Lyle*, 919 F.3d 716, 728 (2d Cir. 2019) (citing *South Dakota v.*

*Opperman*, 428 U.S. 364, 368–69 (1976)). Once police take custody of a vehicle, "they may

search the vehicle and make an inventory of its contents without need for a search warrant and

without regard to whether there is probable cause to suspect that the vehicle contains contraband

or evidence of criminal conduct." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008)

(citing *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983)).

Key to the Fourth Amendment analysis, impoundments and inventory searches do not

need to be justified by probable cause, but only on a showing of reasonableness. That is because

impoundments and inventory searches are not conducted "to detect crime or to serve criminal prosecutions," but are undertaken as part of the police's community caretaking function, and thus do not implicate the policies behind the warrant and probable cause requirements. *Id.*; *Lyle*, 919 F.3d at 728. Impoundment promotes public safety by "seiz[ing] and remov[ing] from the streets vehicles impeding traffic or threatening public safety and convenience." *Opperman*, 428 U.S. at 369. Inventory searches of impounded vehicles protect (1) the owner's property while it is in police custody; (2) the police against spurious claims of lost or stolen property; and (3) the police from potential danger. *Lopez*, 547 F.3d at 369 (citation omitted).

In evaluating whether an inventory search following impoundment satisfies the Fourth Amendment, courts engage in two distinct inquiries: "first, whether the impoundment of a car is reasonable; and second, if so, whether the subsequent search of the car after the impoundment is reasonable." *Lyle*, 919 F.3d at 730 n.2 (citing *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) ("[T]he decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')."))

i.    The Decision to Impound

In evaluating an impoundment decision, the Second Circuit inquires whether the "decision to impound is reasonable . . . based on all the facts and circumstances of a given case." *Id.* at 731 (citation omitted). Officers "may exercise their discretion in deciding whether to impound a vehicle, 'so long as that discretion is exercised . . . on the basis of something other than suspicion of evidence of criminal activity.'" *Id.* at 728 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1976)). Thus, an officer cannot act "solely for the purpose of investigation." *Id.* at 731. In practice, this means that the officers must be motivated, in part, by a community caretaking function.

Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Id.* at 731 (citation omitted). In *Lyle*, the Second Circuit identified a variety of factors as germane to the objective reasonableness inquiry. These include: (1) the availability of a third party to entrust with the vehicle's safekeeping; (2) the length of time the vehicle would be left unattended; (3) whether the vehicle would become illegally parked if left unattended; (4) the risk of the vehicle being stolen, damaged, or becoming a nuisance if left unattended; (5) whether the vehicle was parked in a public or private space. *Id.* at 731. That said, the Circuit cautioned, "[w]hile the existence of and an officer's adherence to [] standardized criteria" may be a factor in evaluating the reasonableness of an impoundment, officers are not required to use "a standardized impoundment procedure." *Id.*

ii.     The Conduct of an Inventory Search

For an inventory search to be reasonable under the Fourth Amendment, the officer conducting the search must "act in good faith pursuant to 'standardized criteria . . . or established routine.'" *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). The existence of such a procedure may be proven by reference to "either written rules and regulations, or testimony regarding standard practices." *Id.* (citations omitted). "The policy or practice governing inventory searches should be designed to produce an inventory." *Wells*, 495 U.S. at 4. However, the Second Circuit has not required that "every detail of search procedure . . . be governed by a standardized policy." *Lopez*, 547 F.3d at 371.

As with impoundments, inventory searches "must not be a pretext for a general rummaging in order to discover incriminating evidence." *Thompson*, 29 F.3d at 65–66 (citations and internal quotation marks omitted). But the Supreme Court "has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search." *Lopez*,

547 F.3d at 372. On the contrary, when circumstances suggest a probability of discovering criminal evidence, courts recognize that officers will inevitably be motivated in part by criminal investigative goals. "Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes." *Id.*

### iii. Subjective Motivation

As reflected above, officers' subjective motivations may bear upon the reasonableness of both the decisions to impound a vehicle and to subject it to an inventory search. As to each, the Supreme Court has held, officers cannot act *solely* for the purpose of criminal investigation. The inquiry of any sort into subjective motivations is unusual in Fourth Amendment reasonableness analysis, which, as *Whren* reflects, is ordinarily solely an objective inquiry. *See* 517 U.S. at 813–15; *see also Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001) (improper subjective motivation did not render arrest unlawful); *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011) (with limited exceptions, the Court has "almost uniformly rejected invitations to probe subjective intent" because the Fourth Amendment "regulates conduct rather than thoughts"); *United States v. Fiseku*, 915 F.3d 863, 871 n.6 (2d Cir. 2018) ("In determining whether police conduct is consistent with the Fourth Amendment, we assess the circumstances objectively, and not according to the subjective motivations of police officers . . . ." (citation omitted)). The Court here reviews the case law from which the doctrine has arisen that permits inquiry into subjective motivations in the context of impoundment and inventory search decisions. The Court does so to guide its analysis, because the evidence in this case reflects that the officers, having identified Rivera during, and having decided to stop his van to advance, a narcotics investigation, were demonstrably motivated to search his car for narcotics and paraphernalia.

The doctrine authorizing inquiry into subjective motivations in limited Fourth Amendment contexts has its roots in a line of cases beginning with the 1976 decision in *Opperman*, in which the Supreme Court recognized inventory searches as an exception to the Fourth Amendment's warrant requirement. *See also Lafayette*, 462 U.S. at 643; *Bertine*, 479 U.S. at 371. *Opperman* also exempted such searches from the probable cause requirement because "probable cause is peculiarly related to criminal investigations." 428 U.S. at 370 n. 5. The Court noted that inventory searches are routinized administrative procedures conducted as part of the police's community caretaking function. *Id.* It followed that the reasonableness of an inventory search should not turn on the existence of probable cause when no claim is made that the inventory search procedure is "a subterfuge for criminal investigation[]." *Id.*

In *Opperman,* the Court noted, there had been "no suggestion whatever that this standard procedure . . . was a pretext concealing an investigatory police motive." *Id.* at 376. In two ensuing inventory search cases, the Court reiterated the principle, while noting the absence of evidence of investigative motive in the case at hand. In *Bertine*, the Court noted that "[i]n the present case, . . . there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." 479 U.S. at 372. And in *Florida v. Wells*, the Court reiterated that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence," and that an officer conducting such a search "must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" 495 U.S. at 4 (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)). None of these cases thus involved a claim that the officers had acted, even in part, based on investigatory motivations.

The Supreme Court's later cases touching on this point have reiterated that inventory searches are anomalous in Fourth Amendment doctrine insofar as they permit consideration of subjective motivation as part of the reasonableness inquiry. But—like *Opperman*, *Bertine*, and *Wells*—they have offered only limited guidance on the operative analysis to apply in a case in which a subjective investigative motivation was found to have been an impetus for the search. In *Kentucky v. King*, 563 U.S. 452, 464 (2011), and in *Whren*, 517 U.S. at 812, each presenting Fourth Amendment issues not implicated here, the Court noted that subjective motivation may bear upon the reasonableness of an inventory search. *See King*, 563 U.S. at 464 ("[W]e have never held, outside limited contexts such as an 'inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" (quoting *Whren*, 517 U.S. at 812)); *Whren*, 517 U.S. at 812 ("Not only have we never held, outside the context of inventory search or administrative inspection (discussed above), that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary."). And in *Brigham City v. Stuart*, 547 U.S. 398 (2006), a case involving the emergency aid exception to the warrant requirement, the Court likened programmatic searches not conducted for criminal investigative reasons—the programmatic use of drunk-driving checkpoints—to inventory searches. In each, the Court noted, "'an inquiry into *programmatic* purpose' is sometimes appropriate. . . . But this inquiry is directed at ensuring that the purpose behind the *program* is not 'ultimately indistinguishable from the general interest in crime control.' . . . It has nothing to do with discerning what is in the mind of the individual officer conducting the search." *Id.* at 405 (citations omitted).

The Second Circuit, however, has engaged with the factual scenario here: in which the police had an investigative motivation to search, but defend the decisions to impound and to conduct an inventory search as objectively reasonable (indeed, compulsory).  In a series of cases, the Circuit has stated that evidence found during such a post-impoundment inventory search "will be suppressed when the searching agents act in bad faith or *solely* for the purpose of investigation." *Thompson*, 29 F.3d at 65 (emphasis added); *see also United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988) ("An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of investigation." (citations omitted)); *Lopez*, 547 F.3d at 370 ("Our court has noted that a consideration in determining the reasonableness of an inventory search is whether the officials conducting the search acted in good faith pursuant to standardized criteria or established routine." (cleaned up)).  The Circuit in *Lopez* in 2008 expanded on this principle in an instructive manner.  It explained that "the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search." 547 F.3d at 372.  On the contrary: "When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives.  Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes." *Id.* (citations omitted).  Applying this rule to the search at issue, the Circuit stated, "while the officers may well have had an investigative motivation to search Lopez's car, the circumstances called for the impoundment of his car, as Lopez was arrested for driving it while intoxicated, and the impoundment required the conduct of an inventory search." *Id.*

In its 2019 decision in *Lyle*, the Circuit applied these principles with a focus on the challenged decision to impound a vehicle. 919 F.3d at 730–32. The Circuit stated that "whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case." *Id.* at 731 (quoting *United States v. Coccia*, 446 F.3d 233, 239 (1st Cir. 2006)). Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Id.* (citation omitted). But, among the factors the Circuit considered in this "objective" inquiry into the "totality of the circumstances" was whether the officers acted in "good faith or solely for the purpose of investigation." *Id.*

In its later decision in 2019 in *United States v. Williams*, the Circuit reviewed Fourth Amendment case law in areas permitting an inquiry into subjective motivations. 930 F.3d 44, 53–55 (2019). "In general," the Circuit noted, "an action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Id.* at 56 (emphasis in original) (cleaned up). The Supreme Court, the Circuit noted, had "affirmed that inventory searches are reasonable for Fourth Amendment purposes when administered in good faith, according to standard criteria on the basis of something *other than suspicion of evidence of criminal activity*." *Id.* (emphasis in original) (citation and internal quotation marks omitted). And, it noted, Supreme Court dicta "has suggested that the inventory search doctrine may be a rare example in which an officer's improper motive *can* invalidate objectively justifiable behavior under the Fourth Amendment." *Id.* (emphasis in original) (citations omitted). *Williams*, however, did not find a need to "parse these lines of Supreme Court authority further and assess whether an officer's motive might prove relevant to the validity of an inventory search." *Id.* at 56–57. Instead, it found the case factually on all fours with *Lopez*. Because the search was conducted under standardized

procedures, it "falls under the inventory exception . . . , notwithstanding a police expectation that the search will reveal criminal evidence." *Id* at 57 (quoting *Lopez*, 547 F.3d at 372). That "detectives also expected that they might find evidence of a crime during their second search . . . did not obviate the need for that second inventory search." *Id.* The Circuit added that "[d]istrict courts in our Circuit have correctly interpreted *Lopez* to mean that an officer's subjective motivations in performing an inventory search generally will not invalidate an otherwise-reasonable search." *Id.* at 57 n.4 (citing *United States v. Wallace*, No. 15 Cr. 794 (KBF), 2016 WL 4367961, at *10 (S.D.N.Y. Aug. 11, 2016), *aff'd*, 937 F.3d 130 (2d Cir. 2019); *Bryant v. Vill. of Greenwood Lake*, No. 11 Civ. 7788 (ER), 2013 WL 5952610, at *4 (S.D.N.Y. Nov. 6, 2013), *aff'd sub nom. Bryant v. Dasilva*, 582 F. App'x 56 (2d Cir. 2014)).

The assembled cases can be distilled as follows. Officers may not impound and conduct an inventory search for the sole purpose of criminal investigation. But, if, objectively, "the circumstances called for the impoundment" of the vehicle and its inventory search, *Lopez*, 547 F.3d at 372, then the fact that the officers also acted with criminal-investigation motives will not invalidate the search. Put differently, *Lopez* and *Williams* together teach that where objective circumstances call for the impoundment of a vehicle and its inventory search, and where that search was performed consistent with set standards, these steps are justified by the police's community caretaking function. And decisions to impound and inventory-search that otherwise are reasonable "will not be rendered unreasonable merely because an officer is motivated in part by investigatory purposes or by the expectation that the search will yield evidence." *Bryant*, 2013 WL 5953610, at *4 (citation omitted). Thus, as *Williams* synthesized the doctrine, "an officer's subjective motivations in performing an inventory search *generally* will not invalidate an otherwise-reasonable search." 930 F.3d at 57 n.4 (emphasis added).

b. *Discussion*

    i.    The Decision to Impound

With these principles in mind, the Court first analyzes the decision to impound Rivera's van. The Government argues that that decision was not only objectively reasonable, but unavoidable and compulsory. *See Lyle*, 919 F.3d at 731. Rivera argues that there were alternatives to impoundment, but that the officers, driven by an investigative interest, overlooked these. The Court holds with the Government, finding the decision to impound, rather than leaving the van unattended on a busy commercial Bronx thoroughfare, not only objectively reasonable, but the only objectively reasonable course of action, given the factors the Circuit has identified as germane. These include: the availability of a third party to entrust with the vehicle's safekeeping; the length of time the vehicle would be left unattended; whether the vehicle would be illegally parked if left unattended; the risk of the vehicle being stolen, damaged, or becoming a nuisance; and whether the vehicle was parked in a public or private space. *Id.*

Rivera was the van's sole occupant. With his arrest, the officers had to decide whether to impound the van or leave it unattended on Exterior Street. As the officers convincingly testified, impounding the van was the only practical alternative. There was no third party "immediately available to entrust with the vehicle's safekeeping," and the officers "could not be certain how long the [van] would be unattended in [Rivera's] absence." *Id.* And there was no viable place to park the unattended van. Leaving it double-parked in the stream of traffic was untenable. Exterior Street was a busy commercial street, and with a playoff game at nearby Yankee Stadium to start in a matter of hours, the double-parked van would immediately have become a traffic-impeding nuisance. Tr. 68 (Hadzewycz). Nor was there a lawful parking space immediately apparent. The officers noticed "no parking" signs along the street, meaning that, barring finding

such a space somewhere else, the van, if parked on Exterior Street, would have been illegally parked immediately upon the officers' departure. *See id.* at 35–36 (Hadzewycz), 97 (Hyde), 116 (Dossi). Even if a lawful parking space could have been found, the van was at risk of being stolen or damaged. *See, e.g., United States v. Best*, 415 F.Supp.2d 50, 56 (D. Conn. 2006) ("Safeguarding individuals and their property from harm is the essence of the 'community caretaking function' of the police."); *United States v. Messina*, No. 8 Cr. 529 (LMM), 2009 WL 455306, at *3 (S.D.N.Y. Feb. 24, 2006) (same); *United States v. Miner*, 956 F.2d 397, 399 (2d Cir. 1992) (it is part of the "community caretaking function" of the police to protect a motor vehicle from vandalism). As the officers testified, the van was noticeably full of personal possessions, making it an inviting target for theft and vandalism. Tr. 37 (Hadzewycz), 90 (Hyde), 116 (Dossi). Finally, leaving the van unattended posed safety concerns to the public given the likelihood the officers perceived that Rivera was using it to deliver narcotics in connection with the sale he had arranged with the undercover. *Id.* at 36 (Hadzewycz). For these reasons, the officers credibly testified, the caretaking need to impound the van was obvious.

Rivera makes four arguments in response. None is persuasive.

First, he argues, based on the officers' characterization of Exterior Street as a "service road," the car could have been lawfully left there until he returned to retrieve it. The testimony belies that argument. As the officers explained, although Exterior Street runs under the Major Deegan Expressway and in that respect is a service road, it functions as a normal street with two lanes of normal traffic. *Id.* at 89 (Hyde). All three testified to seeing "no parking" signs on the block, *see id.* at 35–36 (Hadzewycz), 89, 97 (Hyde), 116 (Dossi), indicating that Rivera's van could not have been lawfully parked there. Rivera did not develop evidence showing there was a realistic alternative place to lawfully park the car while Rivera was at the precinct. In any event,

even had the officers found a lawful parking space nearby, that would not have eliminated the significant risk of theft, vandalism, or exposing the public to the narcotics believed to be inside.

Second, Rivera argues, because he had been arrested for mere equipment violations—the van's broken taillight and the cracked windshield—the arresting officers knew they could not detain him for long. Thus, he argues, they should have appreciated that his van would not have been left unattended for long. That argument does not respond to the risks of theft, vandalism, and exposure that the van presented for however long it sat unattended. And, by the time the officers left the scene, they had also learned that Rivera was unable to produce a driver's license. *Id.* at 88 (Hyde). Although the point had yet to be confirmed, the officers reasonably suspected that Rivera's license was suspended. *Id.* at 23–24 (Hadzewycz). Indeed, the officers testified, one reason they took Rivera to the precinct was to confirm whether he had a valid license and could operate the vehicle. *Id.* at 88 (Hyde), 122 (Dossi). Thus, the officers had good reason to doubt that Rivera could lawfully operate the van—and thus retrieve it from Exterior Street— upon his release. *See Lyle*, 919 F.3d at 731 (driver's suspended license supported impoundment).

Third, Rivera argues that the decision to impound was unreasonable in light of New York Vehicle and Traffic Law § 376-a(4), which gives drivers the right to correct defective equipment within one business day. Impounding his car, Rivera argues, violated that right. That argument fails for multiple reasons. To begin, the officers reasonably doubted that Rivera had a valid driver's license; if not, it would have been unlawful for him to drive the van from Exterior Street to repair its taillight and windshield. Moreover, the reasonableness of impoundment turns on the totality of circumstances; here, the officers reasonably concluded the vehicle could not be left alone on Exterior Street, even for the limited period needed to determine whether Rivera had a valid license. Tr. 88 (Hyde). Most fundamentally, Rivera's right to correct the defective

equipment within a business day did not deprive the officers of authority to arrest him for the cited traffic infractions under New York state law. *See* N.Y. Crim. Proc. Law § 140.10(2) (authorizing police officers to arrest a person for a petty offense); *id.* § 1.20(39) (defining petty offense as "a violation or a traffic infraction"). Rivera does not dispute that point. These legal provisions are easily harmonized: Once Rivera was arrested, processed, and released, the van (provided he had a valid license) would have been returned to him, at which point he could have corrected the defective equipment, with the consequence that the "complaint issued" for the equipment "violation[s] shall be dismissed" pursuant to New York Vehicle and Traffic Law § 376-a(4). Rivera's lawful arrest can coexist with his right to repair the van's equipment.

Finally, Rivera argues that officers should have given him the opportunity to try to locate a third party to take custody of the van. But, as *Lyle* instructs, the officers did not have such a duty. After Lyle was arrested, he had "asked for the opportunity to arrange for his girlfriend . . . to remove the rental car," but the officers did not grant this request, and impounded the stopped car; the Circuit, in denying Lyle's suppression motion, held that "the police were not required to grant the request." 919 F.3d at 731. Here, Rivera, unlike Lyle, never even made such a request. If the officers were not obliged to grant such a request in *Lyle*, it follows *a fortiori* that they were not obliged here to affirmatively investigate, during a stop on a crowded commercial street, whether a third party could take custody of his van. And, on the facts known, it would have been unreasonable to require the officers, *sua sponte*, to explore the availability of a third-party savior. Rivera had just driven into the Bronx from out of state in a van bearing an Illinois plate, for the apparent purpose of a drug deal. And the records accessible to the officers showed that Rivera's (possibly suspended) driver's licenses were from far away, in Illinois and Wisconsin. To assume

that a friend or relative was nearby who could take custody of the van during Rivera's arrest and processing would have been unreasonable conjecture.

For these reasons, as the officers testified, there were compelling objective reasons to impound Rivera's van and no realistic alternative to doing so. On this point, this case is on all fours with *Lyle*, which upheld impoundment of a vehicle stopped "on a public street in a busy midtown Manhattan location." *Id.* at 731. Otherwise, the Circuit noted, Lyle's rental car would have been left unattended on a public street "where it could have become a nuisance or been stolen or damaged and could have become illegally parked the next day." *Id.* (citation omitted). So, too, here. Indeed, impoundment here was even more clearly required than in *Lyle*, given the traffic impediments the van would have presented if left on busy Exterior Street hours before a nearby playoff game, and the risks presented given the illegal drugs it was believed to harbor.

The Court, finally, has considered the situation recognized in *Lyle*—and the line of cases reviewed above—in which officers who impounded a van did so in bad faith or "solely for the purpose of investigation." *Id.* The Court does not find either circumstance here. The defense has not claimed (and the evidence does not support) bad faith. The officers did have (as they acknowledged) an investigative interest in searching the van, believing that Rivera was acting as a "narcotic[s] courier." *See* Tr. 51–52 (Hadzewycz). But the assembled evidence shows that the officers also had a shared recognition that impoundment was objectively required as a matter of community caretaking. The Court credits the three officers that they appreciated this necessity in real time. And although there was no direct evidence of Sergeant Pellerano's thinking, the Court infers that he, too, would have grasped that the circumstances made impoundment necessary for "legitimate custodial purposes." *Lopez*, 547 F.3d at 372. Thus, the Court finds that the officers did not act "solely for the purpose of investigation" and that the impoundment here comported

with the Fourth Amendment, *Lyle*, 919 F.3d at 731. *See also Lopez*, 547 F.3d at 372 ("the Supreme Court has not required an *absence* of expectation of finding criminal evidence as a prerequisite to a lawful inventory search") (emphasis added); *Williams*, 930 F.3d at 57 n.4 ("[A]n officer's subjective motivations in performing an inventory search generally will not invalidate an otherwise-reasonable search." (citations omitted)).

Finally, although not necessary to this decision, even if—contrary to the findings above—the evidence had shown that the officers had impounded the van driven solely by a desire to investigate a narcotics offense, on the facts here, the inevitable discovery doctrine would have come into play. That doctrine exempts from the exclusionary rule evidence seized unlawfully where "the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (internal quotation mark omitted) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). A court applying the doctrine determines, "viewing affairs as they existed at the instant before the unlawful search [or seizure], what *would have happened* had the unlawful search [or seizure] never occurred." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (emphasis in original) (citation omitted). "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Id.* (cleaned up) (citations omitted).

Here, Rivera's van had been lawfully stopped and he had been lawfully arrested, and the officers had recognized, as was clear, that Rivera (lacking a license and with no evidence of a valid license) could not be left with the car. He had to be brought to the precinct. Under those circumstances, the on-scene officers inevitably would have been presented with the issue of what to do with the van. For all the reasons above, on even a moment of reflection, the officers would

have appreciated—as the Court has found they in fact did—that impoundment was absolutely necessary. Thus, there was no realistic alternative to impoundment, and consideration of this question free of improper investigative motives could have yielded no other outcome. *See, e.g.*, *United States v. Mendez*, 315 F.3d 132, 137–38 (2d Cir. 2002) (affirming denial of suppression motion; even if the initial search of car was unlawful, the evidence would have been inevitably discovered in the course of a valid inventory search); *Eng*, 997 F.2d at 990–92 (affirming denial of suppression motion; evidence found during unlawful search would have been inevitably discovered during ongoing tax-evasion investigation); *United States v. Cancel*, 167 F. Supp. 3d 584, 597 (S.D.N.Y. 2016) (denying suppression motion where evidence obtained from unlawful search inevitably would have been found in the course of a valid inventory search).

### ii.    The Inventory Search

For an inventory search to comply with the Fourth Amendment, it must be made in "good faith pursuant to 'standardized criteria . . . or established routine.'" *Thompson*, 29 F.3d at 65 (quoting *Wells*, 495 U.S. at 4). Rivera originally argued that the inventory search at the precinct that followed the impoundment of his van was unreasonable, because the Government had not produced evidence of a written department policy governing the officers' inventory search.

In the suppression hearing, the Government offered, as an exhibit, NYPD Patrol Guide Procedure No. 218-13, the NYPD's standardized inventory search policy. GX 105. It states that officers must conduct an inventory search of every vehicle that comes into police custody. *Id.* at 1. And it sets out the parameters and mechanics of an inventory search, including requiring that the officers conducting such a search: (1) "[s]earch the interior of the vehicle thoroughly"; (2) "[f]orce open [the] trunk [and] glove compartment . . . only if it can be done with minimal

damage"; and (3) "[r]emove all valuables from the vehicle and invoice [them] on a separate property clerk invoice." *Id.* (emphasis removed).

The undisputed evidence at the suppression hearing was that the officers adhered to these "standardized criteria" in conducting the inventory search of the van.  Officer Hyde and Agent Hadzewycz followed the requirements of Patrol Guide Procedure No. 218-13 by comprehensively vouchering and inventorying the items found.  The officers then created a "property clerk invoice" documenting their work.  Tr. 118 (Dossi).

This evidence easily establishes by a preponderance that the officers conducted the search "in good faith pursuant to standardized criteria . . . or established routine." *Thompson*, 29 F.3d at 65 (citation and internal quotation marks omitted).  And, at the close of the hearing Rivera effectively conceded the point, stating that he no longer challenged the inventory search *per se*, but merely the preceding impoundment decision.  Tr. 145–46.

### 2.  The Automobile Exception

#### a.  *Applicable Legal Standards*

Under the "automobile exception" to the warrant requirement, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (citations omitted).  The bases for this exception include (1) a vehicle's inherent mobility; and (2) a citizen's diminished expectation of privacy in her vehicle as compared to her home. *See United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007).

"Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be

searched." *United States v. Jones*, 893 F.3d 66, 71 (2d Cir. 2018) (cleaned up) (citations omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Johns*, 469 U.S. 478, 484 (1985) (citation omitted). Additionally, a warrantless search of a vehicle does not need to occur contemporaneously with its lawful seizure. *Id.*

### b. Discussion

For the exception to apply, officers must have had "probable cause . . . to believe [that Rivera's van] contain[ed] contraband or other evidence of a crime." *Gaskin*, 364 F.3d at 456. In determining whether probable cause exists, courts must "not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." *Id.* at 457 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The Government argues that the officers had probable cause to believe that Rivera was the user of the Target Cellphone who had arranged that day's narcotics delivery in the Bronx, and that the van he had driven to the Bronx contained narcotics or evidence of narcotics trafficking. Rivera counters with two arguments. First, he argues, the Court must disregard in its probable cause analysis the information that Agent Hadzewycz learned when he reached into Rivera's van and picked up his cellphone, as that action violated the Fourth Amendment. Second, he argues that the remaining evidence does not supply probable cause to search the van.

### i.   The Seizure of Rivera's Cellphone

At the threshold, the Court agrees with Rivera's methodological point—that the Government has not shown that Agent Hadzewycz lawfully seized Rivera's cellphone from the van's front seat, and that the fruits of that action (the observation that Agent Hadzewycz's phone number appeared on the phone) thus cannot be considered in assessing probable cause. As of the

stop of the van, the officers knew that the Target Cellphone that an undercover officer had called to arrange a narcotics pickup that day in the Bronx was registered to a "Daniel Rivera," who lived in Illinois and had driver's licenses from both Illinois and Wisconsin. *See* Tr. 17–19, 22–23 (Hadzewycz).  The officers also had a driver's license photo of Daniel Rivera.  *See id.* at 22–23 (Hadzewycz).  GPS data showed that the Target Cellphone was travelling from New Jersey to the Bronx. *See id.* at 80 (Hyde).  Using this data, officers then found and stopped the van bearing an Illinois license plate in the Bronx near Yankee Stadium. *See id.* at 26–27 (Hadzewycz).  During the stop, the officers further learned that the van's driver and registered owner was a Daniel Rivera, who closely resembled the photo of the Rivera to whom the Target Cellphone was registered. *See id.* at 27, 29 (Hadzewycz).  On this basis, the officers reasonably concluded that the driver they had stopped was the person with whom the undercover officer had communicated the previous night to arrange the Bronx drug deal.

Rivera's methodological challenge is focused on what happened after officers handcuffed Rivera. Agent Hadzewycz noticed Rivera's cellphone on the driver's seat. *See id.* at 30 (Hadzewycz), 85 (Hyde).  Seeking to confirm that the Daniel Rivera before him was the user of the Target Cellphone, Agent Hadzewycz called the Target Cellphone number to determine whether the Target Cellphone was in Rivera's possession. *See id.* at 30 (Hadzewycz).  Immediately after, the cellphone on the driver's seat "activated," *id.* at 86 (Hyde); *see also id.* at 30 (Hadzewycz), 121 (Dossi).  Although the precise method of its activation—whether it rang, vibrated, or lit up—was not established, the Court credits that it did so immediately after Agent Hadzewycz called the Target Cellphone number. *See id.* at 30–32 (Hadzewycz), 86–87 (Hyde), 121 (Dossi).  The Fourth Amendment permits that fact to be considered, because the cellphone was in "plain view" on the driver's seat, and the "officer's mere observation" of its becoming

activated does not constitute a Fourth Amendment search. *Horton v. California*, 496 U.S. 128, 134 n.5 (1990) ("[A]n officer's mere observation of an item left in plain view . . . involves no Fourth Amendment search."). The telltale activation of Rivera's cellphone immediately after Agent Hadzewycz called the Target Cellphone thus may be considered in determining whether there was probable cause to believe the van contained evidence of a narcotics crime.

Agent Hadzewycz's next act—reaching into the van and picking up the phone from the driver's seat to confirm that the agent's phone number appeared on its screen, Tr. 31 —presents a different Fourth Amendment question. Picking up the phone was a warrantless seizure. The Court is unpersuaded that this seizure fell within an exception to the warrant requirement. The Government defends the seizure as incident to a lawful arrest. That is incorrect. Under *Arizona v. Gant*, 556 U.S. 332 (2009), police may search a vehicle incident to a recent occupant's arrest in two circumstances: first, when "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," *id.* at 343; and second, "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle," *id.* at 335 (citation and internal quotations omitted). Neither circumstance applies here. By the time Agent Hadzewycz reached into the van, Rivera had been removed and handcuffed. *See* Tr. 29–30 (Hadzewycz), 84–85 (Hyde). He was thus secured and outside reaching distance of the passenger compartment. And the offenses for which Rivera had been arrested, as of then, did not implicate the cellphone. These were the vehicular violations involving the broken taillight and the cracked windshield. Officers would not have reason to believe that a cellphone inside the van contained evidence of these infractions. *See Gant*, 556 U.S. at 343 ("[W]hen a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle

contains relevant evidence." (citations omitted)).  There was no contrary evidence presented at the suppression hearing.[9]

Accordingly, in its probable cause analysis, the Court cannot consider the one piece of information gleaned from Agent Hadzewycz's reaching into the van to pick up the cellphone: his observation that his phone number appeared, which re-confirmed that Rivera was the user of the Target Cellphone.  However, the Court can consider all other information discovered during the stop, including the similarly probative fact that Rivera's phone visibly activated immediately upon Agent Hadzewycz's calling the Target Cellphone.

### ii.    Probable Cause Analysis

"Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *Jones*, 893 F.3d at 71 (cleaned up).  The probable cause inquiry is a commonsense, non-technical one, based on the totality of the circumstances rather than on the satisfaction of discrete criteria.  *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008); *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).  "[P]robable cause is a fluid concept—turning on the assessment of probability in particular factual contexts." *Gates*, 462 U.S. at 232.  Its focus is on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

---

[9] Nor could the cellphone be seized on the ground that officers saw it activate in the course of a crime in progress. *See United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *13 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 915 F.3d 863 (2d Cir. 2018).  By the time Agent Hadzewycz called the phone, Rivera was in custody, away from the phone, and not acting to facilitate the arranged drug sale.  The phone call initiated by Agent Hadzewycz was an evidence-gathering tool by law enforcement, not a step toward completion of an ongoing crime.

*Brinegar v. United States*, 338 U.S. 160, 175 (1949). The probable cause standard "does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." *Gaskin*, 364 F.3d at 457 (citation omitted).

The Court has little difficulty here finding probable cause to support that Rivera's van harbored evidence of a narcotics offense, including the narcotics themselves. As developed above, the officers, as of the time the van was impounded, had compelling evidence, easily sufficient to supply probable cause, to believe that the driver was the Daniel Rivera whose Target Cellphone had been used to an arrange an imminent sale of multiple "pieces" of narcotics in the Bronx. Specifically, they knew that an undercover officer had called the Target Cellphone and spoke in Spanish with an unidentified man to arrange a narcotics delivery there on October 11, 2022. They knew the Target Cellphone was registered to Daniel Rivera, who lived in Illinois and had driver's licenses in both Illinois and Wisconsin. They knew, from GPS data, that the Target Cellphone had travelled from New Jersey to the Bronx, the site of the intended narcotics sale. They knew, from the driver's license photo, that the van's driver closely resembled the Daniel Rivera to whom the Target Cellphone was registered. And when Agent Hadzewyzk called the Target Cellphone, they observed that the driver's cellphone, left on the driver's seat, had activated. Considered together, this evidence, provided solid support, easily constituting probable cause, that Rivera was the counterparty to the drug sale arranged with undercover officer.

Based on the totality of the circumstances, officers also had probable cause to believe that Rivera's van contained narcotics or other evidence of narcotics trafficking. The undercover officer had dealt with Rivera, alone, in arranging the drug transaction. Rivera, alone, had agreed to meet the undercover that day in the Bronx to deliver narcotics. He had driven the van to the

Bronx, the site of the arranged delivery. And the van that Rivera drove had ample space to house

kilogram quantities of narcotics. Although it was conceivable that the narcotics would be

delivered by other persons or means, it stood to reason that the van likely housed the narcotics to

be sold. *See, e.g.*, *Howard*, 489 F.3d at 491 (police had probable cause to believe defendant was

transporting cocaine in his car based on six intercepted phone calls where defendant participated

in arranging a drug transaction); *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)

(police had probable cause to believe that rental car contained illegal drugs after police received

tip from a confidential informant that defendant had gone to New York to buy drugs, and would

be returning to Maryland in a rented car).

Indeed, even if Rivera had had a collaborator on the supply side, with the plan being for

Rivera to arrive at the place of the narcotics delivery independent of the narcotics, there was

probable cause to believe that his van contained evidence of the narcotics crime. The van had

held, moments earlier, the cellphone whose activation upon Agent Hadzewycz's test call showed

that it was the phone that had been used to arrange the narcotics transaction. The officers also

observed, from outside the van, that it was full of personal possessions, such as clothes, bags,

and tools. Under the circumstances, there was a "fair probability," *Gaskin,* 364 F.3d at 457, that

the van held not only narcotics, but also evidence of drug trafficking, whether paraphernalia,

notes and records of drug transactions, communications devices used in arranging such

transactions, or trace elements of the drugs. *See, e.g., id.* at 457 (police had probable cause to

believe that guns, cell phones, and money linked to defendant's drug dealing would likely be

found in his car given that police already knew that defendant was likely driving to take delivery

of 86 pounds of marijuana); *United States v. Babilonia*, 854 F.3d 163, 179 (2d Cir. 2017)

(affirming denial of a suppression motion based on automobile exception because officers had

probable cause to believe that the defendant's vehicle contained contraband in the form of drugs or drug-related proceeds).

There was, thus, probable cause to believe that the van contained contraband or other evidence of a crime—the narcotics offense of which there was probable cause to arrest Rivera. The automobile exception therefore supplied an alternative basis for the officers' lawful recovery of the items in the van. *See, e.g., United States v. Sockwell*, No. 21 Cr. 71 (MPS), 2021 WL 5179978, at *4 (D. Conn. Nov. 8, 2021) (denying suppression motion on basis of automobile exception where police had probable cause to believe the car contained evidence of a drug crime); *United States v. Pascual*, 502 F. App'x 75, 77–78 (2d Cir. 2012) (finding warrantless search of defendant's car justified under automobile exception where police had probable cause to believe that defendant's car contained evidence of narcotics offense).

## CONCLUSION

For the foregoing reasons, the Court denies Rivera's motion to suppress the evidence obtained during the inventory search on October 11, 2022.

The Clerk of the Court is respectfully directed to terminate the motion pending at Dkt. 37.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: October 26, 2023
    New York, New York